890 P.2d 685

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Aaron R. BOLOSAN, Defendant–
Appellant.**

**No. 15993.**

Intermediate Court of Appeals of Hawai'i.

May 16, 1994.

Certiorari Granted (1 application)
June 6, 1994.

Certiorari Denied (1 application)
June 6, 1994.

Deborah Kim, Deputy Public Defender (Dale K. Mattice, Deputy Public Defender, on the briefs), Honolulu, for defendant-appellant.

Lisa Itomura, Deputy Prosecuting Atty., City and County of Honolulu, for plaintiff-appellee.

Before BURNS, C.J., and HEEN and WATANABE, JJ.

WATANABE, Judge.

In this appeal, Defendant–Appellant Aaron R. Bolosan (Defendant) alleges that several reversible errors were committed by the court below in convicting him of: Promoting a Dangerous Drug in the Third Degree, a violation of Hawai'i Revised Statutes (HRS) § 712–1243 (1985); Unlawful Use of Drug Paraphernalia, a violation of HRS § 329–43.5(a) (Supp.1992); Driving Without a License, a violation of HRS § 286–102 (1985); and Driving Without No–Fault Insurance, a violation of HRS § 431:10C–104 (1987 Sp. Pamphlet and Supp.1992).

First, Defendant argues that the motions court improperly denied his Motion to Suppress Evidence because: (1) there were no grounds for the police officer to have initially stopped Defendant; (2) the police illegally ordered Defendant out of his car; (3) the

police officer's pat-down search of Defendant for weapons was illegal; and (4) even if the pat-down search were justified, the permissible scope of the search was improperly exceeded.

Second, Defendant claims that the trial court erred when it convicted him of Driving Without No–Fault Insurance, since the court did not find that he acted intentionally, knowingly, or recklessly, a requisite element of the offense.

Finally, Defendant argues that there was insufficient evidence to support the trial court's finding that Defendant should have been aware that the owner of the car he was driving did not have no-fault insurance.

We affirm Defendant's conviction for driving without a license. However, because we conclude that the trial court applied the wrong state-of-mind element in convicting Defendant of driving without no-fault insurance, we vacate Defendant's conviction for said offense and remand for a new trial on this count. We also reverse Defendant's convictions for promoting a dangerous drug and unlawful use of drug paraphernalia, since our review of the record reveals that the evidence which led to these convictions was seized by police after they unlawfully ordered Defendant to exit his vehicle.

## BACKGROUND

On March 3, 1989, at about 11:20 p.m., Honolulu Police Officer Gerry Asato was in a car at the corner of Gulick Avenue and Pua'ala Lane with Recruit Officer Derrick Martin, when he heard the engine of Defendant's vehicle revving loudly and saw the vehicle emitting a plume of heavy exhaust smoke. At the time, Defendant was stopped at a red light two "really small" blocks away from the officers, at the intersection of Gulick Avenue and School Street, mauka (mountain) bound. State's Exhibit 2, Transcript (Tr.) 6/18/91 at 6, 11, and 12. When the traffic light turned green, Defendant's vehicle proceeded across the intersection toward the location of the officers' car. Defendant neither screeched the tires of his car, nor traveled at a fast rate of speed. Tr. 6/18/91 at 13. The police, however, believing that Defendant's conduct amounted to "exhibition of speed or acceleration" in violation of HRS § 291C–103 (1985), stopped, but did not arrest or cite, Defendant for said offense. Id. at 6.

When Officer Asato approached Defendant's car and asked Defendant, its sole occupant, to produce his driver's license and no-fault insurance card, Defendant was unable to do so. Officer Asato then spotted a closed pocketknife on the front passenger seat of the car, within Defendant's reach. According to Officer Asato, the knife caused him to fear for his safety; he therefore immediately ordered Defendant out of the car for a "pat-down search."

While conducting the pat-down search, Officer Asato "felt [a] round bulblike object in [Defendant's] ... right front pants pocket," which he knew was "a bong[,] ... a glass pipe used to smoke crystal meth or other drugs." Id. at 7. Officer Asato reached into Defendant's pocket and recovered the bong. He also extracted from Defendant's pocket a plain white folded envelope containing a "gritty substance," which he suspected was crystal methamphetamine. Id. at 8. His suspicions were confirmed when the contents of the envelope were later analyzed pursuant to a search warrant.

After discovering the bong and the envelope, Officer Asato arrested Defendant for Promoting Dangerous Drugs in the Third Degree, Unlawful Use of Drug Paraphernalia, Driving Without a License, and Driving Without No–Fault Insurance. Officer Asato then ran a driver's license check on Defendant, which revealed that Defendant had an outstanding traffic warrant; Defendant was arrested for that charge as well.

Defendant was thereafter indicted, tried, convicted, and sentenced for all offenses except the traffic warrant offense.[1] This timely appeal followed.

---

1. At oral argument, defense counsel indicated that the traffic warrant offense was probably tried separately in district court.

## DISCUSSION

### I.

*Validity of the Initial Stop*

The threshold issue we must address is whether the initial stop of Defendant was constitutional.

■ The legitimacy of an automobile stop "is dependent on whether or not it is found to be reasonable, upon balancing the public interest it promotes and the individual's right to be free from arbitrary interference by government officials." *State v. Powell,* 61 Haw. 316, 320, 603 P.2d 143, 147 (1979). The Hawai'i Supreme Court has recognized that the State "has a legitimate and substantial interest in promoting the safe use of its streets and highways[,]" and has the unquestioned "authority to stop vehicles in cases of *observed* traffic or equipment violations." *Id.* (emphasis in original).

■ In the instant case, Defendant was initially stopped because the police observed what they believed was an HRS § 291C–103 violation. We conclude that HRS § 291C–103 did not provide an adequate basis for the stop; however, other grounds existed to justify the stop.

■ At the time of Defendant's stop, HRS § 291C–103 [2] provided in relevant part:

**Racing on highways.** (a) Except as provided in section 291C–149, *no person shall drive any vehicle in any* race, speed competition or contest, drag race or acceleration contest, test of physical endurance, *exhibition of speed or acceleration,* or for the purpose of making a speed record, and *no person shall in any manner participate in any such* race, competition, contest, test, or *exhibition.*

\* \* \* \* \* \*

(d) Any person who violates this section shall be fined not more than $500 or imprisoned not more than six months, or both. [Emphases added.]

Based on the foregoing language, it is clear that the conduct prohibited by the statute is speeding or accelerating a vehicle *while driving.* Since the conduct for which Defendant was stopped occurred while his car was stopped at a traffic light, HRS § 291C–103 did not literally apply to Defendant.

Moreover, in *State v. Spencer,* 67 Haw. 95, 95–96, 678 P.2d 1081, 1081–82 (1984), the Hawai'i Supreme Court held that the exhibition of speed and acceleration offense is not established by evidence that the tires of a defendant's vehicle screeched when the defendant shifted from first gear into second at twenty m.p.h., while making a left turn from a stopped position, and that what HRS § 291C–103 prohibits is the deliberate drawing of public attention to the vehicle's quality for swiftness. If screeching the tires of one's vehicle while traveling at twenty miles per hour does not amount to the offense of exhibition of speed or acceleration, we fail to see how revving the engine of one's vehicle, and causing heavy exhaust smoke to be emitted while stopped at a traffic light can constitute the offense either.

The State argues that since Defendant was stopped while revving the engine of his car, he had to "accelerate" in order to approach the location where he was arrested. However, it is clear from both the title of HRS § 291C–103, "Racing on highways," as well as the language used in the statute, that this offense is not committed merely by an ordinary acceleration of a vehicle [3] from a dead stop. Therefore, the police were not justified in stopping Defendant for violating HRS § 291C–103.

---

2. In 1989, the legislature amended HRS § 291C–103 to define "exhibition of speed or acceleration" to mean "the sudden acceleration of a vehicle resulting in the screeching of the vehicle's tires which is done to intentionally draw the attention of persons present toward the vehicle." Act 151, 1989 Haw.Sess.Laws at 280. The amendment became effective upon its approval on June 7, 1989, after Defendant had been arrested in the instant case.

3. Perhaps a case could be made that an acceleration offense is committed when a driver makes a "jack rabbit" or "drag racing" type of start, in an effort to get his or her car to a high rate of speed in a short span of time. However, that was not the case here.

■ Regardless of the reason expressed by Officer Asato for initially stopping Defendant, we believe that the specific and articulable facts in this case, viewed objectively, would warrant a person of reasonable caution to believe that Defendant had violated 1990 Revised Ordinances of Honolulu (ROH) § 15–19.28 (the Traffic Code of the City and County of Honolulu). *See Powell,* 61 Haw. at 322–23, 603 P.2d at 148. That ordinance provides in relevant part:

**Sec. 15–19.28 Mufflers—Noise–controlling devices.**

(a) No person shall operate a motor vehicle on a public highway or street unless such motor vehicle is equipped, at all times, with a muffler or mufflers in constant operation and of such length and size or of sufficient capacity for the motor and/or exhaust system *to prevent the escape of excessive or annoying fumes or smoke, and excessive or unusual noise.* The term "excessive or unusual noise," as used in this section, means noise in excess of the usual noise which would necessarily result from the operation of a motor when reduced to the minimum by a muffler such as is defined herein.

(b) No person shall operate a motor vehicle on a public highway or street unless the motor and/or exhaust system of such motor vehicle is properly equipped and adjusted so as *to prevent the escape of excessive or annoying fumes or smoke* and the emission of excessive or unusual noise as defined herein. [Emphases added.]

■ Since the evidence in this case clearly establishes that Officer Asato heard the engine of Defendant's vehicle revving loudly and saw the vehicle emitting a plume of heavy exhaust smoke, a reasonable person in the shoes of Officer Asato would have been warranted in believing that Defendant was operating a motor vehicle in violation of ROH § 15–19.28. The police were therefore justified in stopping Defendant to investigate this potential violation, and Officer Asato's articulation of the incorrect basis for the stop does not render it invalid. *Cf. State v. Vance,* 61 Haw. 291, 297, 602 P.2d 933, 938–39 (1979) (warrantless arrest for a misdemeanor offense upheld where the police had probable cause to arrest the defendant under a specific statute although police had a different but closely related statute in mind when making the arrest); *State v. Kimball,* 54 Haw. 83, 87, 503 P.2d 176, 179 (1972) (warrantless arrest upheld even though officer had a preempted ordinance in mind when he arrested the defendant because the facts and circumstances within the officer's knowledge afforded probable cause to arrest the defendant under either the preempted ordinance or the controlling statute); *State v. Hollis,* 161 Vt. 87, ——, 633 A.2d 1362, 1365 (1993).

### II.

### *Validity of the Exit Order*

We next consider the lawfulness of Officer Asato's order that Defendant exit his vehicle.

■ In Hawai'i, unlike at the federal level,[4] "[a] traffic violation in and of itself does not supply reasonable articulable facts to support an order to exit the vehicle." *Kernan v. Tanaka,* 75 Haw. 1, 38 n. 22, 856 P.2d 1207, 1226 n. 22 (1993). A police officer is not authorized to order a driver out of a vehicle after a traffic stop unless the officer has at least a reasonable basis to believe, based on specific articulable facts, that a crime has been committed, *State v. Kim,* 68 Haw. 286, 290, 711 P.2d 1291, 1294 (1985), or that the driver is armed and dangerous. *State v. Joao, Jr.,* 56 Haw. 216, 221, 533 P.2d 270, 274 (1975). The test on appeal is "whether the facts known to the officer, judged against this objective standard, would warrant a [person] of reasonable caution to believe that criminal activity was afoot, that the perpetrator was then armed and dangerous, and that the action taken was appropriate." *Id.*

---

4. In *Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 333; 54 L.Ed.2d 331, 334 (1977), the United States Supreme Court upheld the police practice of ordering all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation. The Court held that the legitimate concern for police safety justifies the practice, since the practice diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault. *Id.*

In *Kernan,* for example, the police officer observed the defendant driving 45 miles per hour in a 25 miles per hour zone, while weaving out of his traffic lane and into the oncoming traffic lanes. The supreme court held that these traffic violations and the totality of circumstances surrounding them provided the officer with a reasonable factual basis to believe that the crime of driving under the influence was being committed, thus justifying the traffic stop and permitting the police officer to order defendant to exit his vehicle for further investigation. *Id.*

Evaluated against the foregoing standard, we conclude that the exit order in the instant case was invalid.

### A.

▮ The motions court concluded that when Defendant was unable to produce a driver's license and a no-fault insurance card, the police had a basis to arrest Defendant and lawfully search him incident to the arrest. Conclusions of Law (COL) Nos. 3, 4 and 8.

▮ However, pursuant to HRS § 286–10 (1985)[5] and HRS § 431:10C–117(a)(1) (Supp.1992),[6] an officer who has grounds to arrest an individual for driving without a license or no-fault insurance is required to issue a summons or citation in lieu of physically taking the defendant to the police station or court, which is the customary procedure under HRS § 803–6 (1985).[7]

Therefore, even if the police had specific articulable facts to believe that Defendant had committed the offenses of driving without a license, a misdemeanor, and driving without no-fault insurance, a petty misdemeanor, they were not authorized to order

---

5. HRS § 286–10 (1985) provides in relevant part:

> **Arrest or citation.** Except when required by state law to take immediately before a district judge a person arrested for violation of any provision of this chapter, including any rule adopted pursuant to this chapter, *any person authorized to enforce the provisions of this chapter, hereinafter referred to as enforcement officer, upon arresting a person for violation of any provision of this chapter, including any rule adopted pursuant to this chapter shall issue to the alleged violator a summons or citation* printed in the form hereinafter described, warning the alleged violator to appear and answer to the charge against the alleged violator at a certain place and at a time within seven days after such arrest.
>
> \* \* \* \* \* \*
>
> Any person who fails to appear at the place and within the time specified in the summons or citation issued to the person by the enforcement officer upon the person's arrest for violation of any provision of this chapter, including any rule adopted pursuant to this chapter, shall be guilty of a misdemeanor.
>
> If any person fails to comply with a summons or citation issued to such person, or if any person fails or refuses to deposit bail as required, the enforcement officer shall cause a complaint to be entered against such person and secure the issuance of a warrant for the person's arrest. [Emphasis added.]

6. HRS § 431:10C–117(a)(1) (Supp.1992) provides:

> **Penalties.**
>
> (a)(1) Any person subject to this article in the capacity of the operator, owner, or registrant of a motor vehicle in this State, or registered in this State, who violates any applicable provision of this article, *shall be subject to citation for the violation* by any county police department in a form and manner approved by the violations bureau of the district court of the first circuit. [Emphasis added.]

7. HRS § 803–6 (1985 and Supp.1992) provides in relevant part:

> **Arrest, how made.** (a) At or before the time of making an arrest, the person shall declare that the person is an officer of justice, if such is the case. If the person has a warrant the person should show it; or if the person makes the arrest without warrant in any of the cases in which it is authorized by law, the person should give the party arrested clearly to understand for what cause the person undertakes to make the arrest, and shall require the party arrested to submit and be taken to the police station or judge. This done, the arrest is complete.
>
> (b) In any case in which it is lawful for a police officer to arrest a person without a warrant for a misdemeanor, petty misdemeanor or violation, the police officer may, but need not, issue a citation in lieu of the requirements of (a), if the police officer finds and is reasonably satisfied that the person:
>
> (1) Will appear in court at the time designated;
>
> (2) Has no outstanding arrest warrants which would justify the person's detention or give indication that the person might fail to appear in court; and
>
> (3) That the offense is of such nature that there will be no further police contact on or about the date in question, or in the immediate future.
>
> \* \* \* \* \* \*

Defendant out of his car, physically arrest him, and search him incident thereto.

### B.

■ The State claims that the presence of a pocketknife on the front passenger seat of Defendant's car was sufficient to cause Officer Asato to believe that Defendant was armed and dangerous, thus justifying the exit order.

■ The record in this case, however, is devoid of any specific and articulable facts which would warrant a reasonable belief that Defendant was armed and dangerous. Although Officer Asato wrote in his police report and testified at the suppression hearing that he feared for his safety when he saw the pocketknife, Tr. 6/18/91 at 16, he never explained the reasons for his fear, or why the presence of a closed pocketknife on Defendant's passenger seat would lead him to infer that Defendant might have weapons on his person.[8] Indeed, the officer admitted that it was not illegal to possess a pocketknife, that Defendant made no suspicious or furtive movements toward the knife, and that the pocketknife was a folding-type pocketknife in the closed position. *Id.* at 15–17. The evidence also indicates that Defendant was the sole occupant of the stopped vehicle, and that Officer Asato was working with a fellow officer, Officer Martin, who was in "the position of cover" when Officer Asato approached Defendant. *Id.* at 14. A police officer's subjective and unparticularized statement that he "feared for his safety" is insufficient to justify an exit order or a pat search of Defendant's person. A higher level of justification is required to permit such an intrusion into Defendant's personal liberty.

We therefore conclude that the motions court should have suppressed the evidence which supported the convictions for Promoting a Dangerous Drug in the Third Degree and Unlawful Use of Drug Paraphernalia.

### III.

#### *Driving Without No–Fault Insurance*

### A.

■ Following the receipt of evidence, the trial judge found and concluded that:

[T]he State has proved beyond a reasonable doubt that the defendant operated a motor vehicle on a public street, roadway, or highway without a valid no-fault insurance policy upon the said motor vehicle, and that *at the very least the Defendant Bolosan did so negligently.* The Court finds and concludes that the State has proved the above beyond a reasonable doubt. Accordingly, the Court finds and adjudges the defendant guilty of the offense of driving without no-fault insurance as charged in Count 4 of the indictment.

Tr. 12/18/91 at 26–27 (emphasis added).

The State has conceded that based on *State v. Lesher,* 66 Haw. 534, 669 P.2d 146 (1983), the intentional, knowing, or reckless states of mind are applicable to the offense of driving without no-fault insurance, and that the trial court erroneously applied the wrong state of mind in determining that Defendant had committed said offense. Answering Brief at 23.

### B.

At trial, Defendant stipulated that he "did not have no-fault insurance" on the date in question. Defendant's Exhibit A, Record on Appeal (R.A.) at 83. The evidence also established that the automobile Defendant was driving belonged to an acquaintance of Defendant and was not covered by a no-fault policy as required by law. *Id.*

At the time of Defendant's arrest in March 1989 for the no-fault charge, the offense was subject to a "good-faith defense, including but not limited to lack of knowledge or proof of insurance." HRS § 431:10C–117(a)(2).

---

8. We recognize that law enforcement personnel, based on their experiences, may view even small pocketknives as dangerous instruments. "This attitude is supported by the fact that occasionally a small knife is found to have a matchstick inserted under the blade so that the knife can be opened hurriedly merely by catching the protruding blade point on the trouser pocket as the knife is taken out. The effect is the same as having a switchblade knife." L. Tiffany, D. McIntyre, Jr., and D. Rotenberg, *Detection of Crime* (The Report of the American Bar Foundation's Survey of the Administration of Criminal Justice in the United States) 47 (1967). However, it is incumbent on a police officer, at a suppression hearing, to articulate the specific reasons for any fears that he may have for his safety.

106

Defendant alleges that he was entitled to an acquittal of the no-fault charge because he, in good faith, believed that the automobile he was driving was properly insured.

Defendant acknowledges that in *State v. Palpallatoc,* 71 Haw. 178, 182, 787 P.2d 214, 216 (1990), the Hawai'i Supreme Court ruled that "in order to satisfy the good faith defense of lack of knowledge, the borrower of a vehicle must at least inquire of the owner whether or not the vehicle is insured," and that testimony by a defendant that he had no knowledge that the vehicle was not covered by no-fault insurance was insufficient to establish the defense.

■ Defendant points out, however, that in 1990, the state legislature reacted to the *Palpallatoc* decision by amending HRS § 431:10C–117(a)(2) to "clarify" that the good faith defense of lack of knowledge is applicable "if the operator [of a borrowed motor vehicle] holds a reasonable belief that the subject vehicle is insured." *See* Act 167, 1990 Haw.Sess.Laws 328, codified as HRS § 431:10C–117(a)(2)(C) (Supp.1992). In explaining the reason for the amendment, the Senate Judiciary Committee stated:

[S]ince the introduction of this bill, the Hawai'i Supreme Court issued a ruling that is contrary to the legislative intent behind penalties for uninsured drivers. In *State v. Palpallatoc,* 71 Haw. [178, 787 P.2d 214 (1990) ], the high court disagreed that a plain reading of Hawai'i Revised Statutes, Section 431:10C–117, clearly provides a good faith defense in a situation where a party lacks knowledge that a vehicle is uninsured. The issue in that case was whether a person who borrows another's vehicle, without knowing that it is uninsured, establishes the defense of lack of knowledge under Section 431:10C–117. The high court ruled that the language of the provision, when viewed in conjunction with the legislative history, did not provide a good faith defense. Citing *State v. Lesher,* 66 Haw. 534, 669 P.2d 146 (1983), the Hawai'i Supreme Court held that it was incumbent upon the borrower of a vehicle to ascertain whether or not it is insured. It was suggested by the Public Defender that your Committee consider this issue and clarify the language of the statute accordingly.

Your Committee shares the concern of the Public Defender that the language of the statute should be amended to clarify the legislative intent in instances where the borrower of a vehicle is charged with an offense under Hawai'i Revised Statutes, Section 431:10C–117, resulting from lack of knowledge that it is uninsured. Your Committee takes the position that a person borrowing a vehicle need not always be under a duty to affirmatively ascertain whether or not the vehicle is insured. To the contrary, your Committee is of the opinion that a person has a right to reasonably believe that a borrowed vehicle is insured, as all vehicles are required to carry coverage by law. However, your Committee recognizes that there may be instances in which a person borrowing a vehicle should affirmatively ascertain whether it is insured. Accordingly, your Committee amends the bill to address the issues raised in the recent *Palpallatoc* case, by adding a provision to Section 431:10C–117(a), which creates a standard for determining when a borrower of a vehicle is not subject to the penalties provided therein. Specifically, if a borrower of a vehicle holds a reasonable belief that it is insured, he has no duty to affirmatively ascertain coverage. In this regard, a court can review on a case-by-case basis whether a person's failure to ascertain coverage was reasonable under the circumstances.

Sen.Stand.Comm.Rep. No. 2616, in 1990 Senate Journal, at 1090–91. *See also* Conf. Comm.Rep. No. 113, in 1990 Senate Journal, at 813–14.

Based on the legislative history of Act 167, Defendant argues that he was statutorily entitled, as a borrower of a vehicle, to assume that the vehicle was insured as required by law. Defendant further argues that this assumption was not unreasonable under the circumstances of the case.

■ Act 167, however, did not become effective until its approval on June 19, 1990, after Defendant had already been charged in this case. Pursuant to HRS § 1–3 (1985), "[n]o law has any retrospective operation, unless otherwise expressed or obviously intended." We are unable to discern, in either the language of Act 167 or its legislative

history, any expressed or obvious intention by the legislature that the new standard established for a good faith defense be applied retroactively. Therefore, based on *Palpallatoc*, we conclude that the evidence does not support Defendant's good faith defense.

However, because the trial court applied the wrong state of mind in determining that Defendant drove without no-fault insurance, we vacate Defendant's conviction for said offense and remand for a new trial.

## CONCLUSION

Based on the foregoing, we: (1) affirm Defendant's conviction for Driving Without a License;[9] (2) vacate Defendant's conviction for Driving Without No–Fault Insurance and remand for new trial; and (3) reverse Defendant's convictions for Promoting a Dangerous Drug in the Third Degree and Unlawful Use of Drug Paraphernalia.

9. Defendant's appeal of the Driving Without a License conviction was based on the alleged illegal stop of his vehicle. However, we concluded that the initial stop of Defendant's vehicle was valid.